UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------X

ANNA MARIA MULE,

           *Plaintiff*,

   - against -

THE DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK, THE BOARD OF
EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK,
JENNIFER GOLDBERG, acting
individually and on behalf of the
Department of Education of the City
of New York, and JANICE ROSS, acting
individually and as Superintendent
on behalf of the Department of
Education of the City of New York,

           *Defendants*.

------------------------------------X

**MEMORANDUM & ORDER**

24-CV-2043(KAM)(SDE)

**KIYO A. MATSUMOTO**, *United States District Judge*:

    Plaintiff Anna Maria Mule commenced an action in state court on February 9, 2024 against the New York City Department of Education (the "Department of Education" or "DOE"), the Board of Education of the City School District of the City of New York (the "Board of Education" and, together with the DOE, the "City Defendants"), Jennifer Goldberg, and Janice Ross. (ECF No. 1-2). Following removal to this Court, Ms. Mule filed a first amended complaint (ECF No. 11) and then a second amended complaint (ECF No. 14 (the "Second Amended Complaint" or "SAC")), enumerating two

causes of action: (1) unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), and (2) unlawful retaliation in violation of the First Amendment.

Presently before the Court are Defendants' motion to dismiss the SAC (ECF Nos. 19–21), Ms. Mule's opposition (ECF No. 22), and Defendants' reply (ECF No. 23). For the reasons set forth below, Defendants' motion to dismiss is **GRANTED**.

## BACKGROUND

Unless otherwise indicated, the following facts are based on the well pleaded allegations in the Second Amended Complaint, "accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (citation omitted). The following also draws on the June 8, 2023 report prepared by the DOE's Office of Equal Opportunity and Diversity Management ("OEO"), substantiating a complaint against Ms. Mule (ECF No. 20-3), which is included in and integral to the allegations of the Second Amended Complaint (*see* SAC ¶¶ 57–59, 61–65 (allegations concerning OEO investigation and June 8, 2023 report)), and therefore properly considered in ruling on a motion to dismiss. *See Nicosia*, 834 F.3d at 234; *see also Hanks v. City of Syracuse*, No. 22-2819, 2023 WL 8889764, at *1–2 & n.2 (2d Cir. Dec. 26, 2023) (affirming grant of motion to dismiss; considering contents of report "rais[ing] concerns about [plaintiff's]

candidacy" for position from which he was excluded allegedly due to race discrimination (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002))).

The Court also considers the charge of unlawful discrimination submitted by Ms. Mule to the New York State Division of Human Rights (the "Division of Human Rights") on May 30, 2023 (ECF No. 20-4), which is properly considered in deciding a motion to dismiss a claim under Title VII. *See Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 565 (2d Cir. 2006) ("In reviewing the Rule 12(b)(6) ruling, it is proper for this court to consider the plaintiffs['] relevant filings with the EEOC [the Equal Employment Opportunity Commission]. . . ."); *Boyar v. Yellen*, No. 21-507, 2022 WL 120356, at *2 (2d Cir. Jan. 13, 2022) (considering contents of plaintiff's charge to the EEOC on appeal from decision granting motion to dismiss Title VII claims).

## I.  Ms. Mule's Employment at the Department of Education

### A.  The Alleged Discrimination Undergirding Ms. Mule's Retaliation Claim

Although the SAC does not allege a discrimination claim, the Court includes Ms. Mule's allegations of discriminatory treatment leading up to her retaliation claim under Title VII.

Ms. Mule began working for the Department of Education in February 1998, and, in 2016, was employed as a high school principal. (ECF No. 20-4 at 3 (CM/ECF numbering); SAC ¶¶ 8-9.)

The SAC alleges that Ms. Mule suffered discrimination beginning in 2016, when Ms. Ross became deputy superintendent, and continuing through at least 2023.  (SAC ¶¶ 9–10; ECF No. 20-4 at 5–7 (CM/ECF numbering).)

### 1.    Incidents Attributed to Ms. Ross

The Second Amended Complaint, generously construed, plausibly alleges twelve specific incidents, statements, or actions attributed to Ms. Ross, who served as a deputy superintendent in 2016 and later served as the superintendent overseeing Ms. Mule's high school.  The SAC fails to allege on which dates several of the alleged statements or actions by Ms. Ross occurred.

> **a.    First, Second, Third, and Fourth Incidents: Ms. Ross "Mocked" Ms. Mule, Asked About Ms. Mule's Ethnicity and Nationality, "Told Faculty Members" that She Was "Looking to Replace" Ms. Mule, and Yelled at Ms. Mule in Front of Students in 2016**

- (1) In 2016, Ms. Ross "mocked Plaintiff and told her that she was heavy," "did not dress well," and "smelled."  (SAC ¶ 10.)

- (2) Also in 2016, Ms. Ross asked about Ms. Mule's ethnicity, country of national origin, and whether she was tenured.  (SAC ¶¶ 11–12.)

- (3) Ms. Ross met with faculty members outside of Ms. Mule's presence in 2016 and "told faculty members Plaintiff was ineffective and that she was looking to replace Plaintiff."  (SAC ¶¶ 10, 13.)

- (4) Ms. Ross "would yell at Plaintiff in front of students, belittling Plaintiff" in 2016.  (SAC ¶ 11.)

Although the Second Amended Complaint does not specifically allege that the four foregoing incidents all occurred in 2016, the

foregoing allegations are in or closely follow paragraph 10 of the SAC, which describes events that allegedly took place in 2016.

> **b. Fifth, Sixth, and Seventh Incidents: Ms. Ross Stated or Implied that Ms. Mule Was Less Able to Perform Her Professional Responsibilities Due to Ms. Mule's Race in 2016, 2019, and 2020**

- (5) In 2016, Ms. Ross "stated that [Ms. Mule] did not know how to talk to the kids at school because Plaintiff was 'white,' and the student body was Black and Hispanic." (SAC ¶ 11.) Although the SAC does not specifically allege that Ms. Ross made the foregoing statement in 2016, the statement immediately follows paragraph 10 of the SAC, which describes events that allegedly took place in 2016.

- (6) In 2019, after Ms. Mule was accepted as a "[n]ew [p]rincipal [c]oach," "a prestigious fellowship offered to high-performing principals," Ms. Ross "did not allow Plaintiff to coach at her school" because Ms. Mule "did not fit in" "as a Caucasian educator in an African American and Hispanic school." (SAC ¶ 20.)

- (7) When Ms. Mule returned to her school from her fellowship in June 2020, Ms. Ross asked "why [Ms. Mule] would bother coming back" and stated that "schools should have principals who look like the kids because representation matters." (SAC ¶ 23.) According to Ms. Ross, because Ms. Mule was Caucasian, she did not represent her school's students, who "were African American and Hispanic." (*Id.*)

> **c. Eighth Incident: Ms. Ross "Start[ed]" and "Spread[] Rumors" that "Plaintiff's Performance Was Lacking" in 2019**

- (8) In 2019, Ms. Ross "tarnished Plaintiff's reputation by starting rumors that Plaintiff's performance was lacking," which rumors were "false but used as a pretext because Ross wanted to terminate Plaintiff and replace Plaintiff with a principal of color." (SAC ¶ 21.) Ms. Ross allegedly spoke to members of the United Federation of Teachers and "spread[]" these rumors "to faculty members." (SAC ¶ 22.)

> **d.    Ninth Incident:    Ms. Ross Honored Black Principals as Excellent in February 2021**

- (9) In "February 2021," Ms. Ross "held a virtual luncheon where black principals were honored as excellent," which allegedly illustrated "a pattern where Caucasian principals are cast in a negative light in public while black principals are celebrated for their work." (SAC ¶ 26.) Ms. Ross allegedly "held a celebration for school leaders" where "only black principals were honored and showcased." (SAC ¶ 27.)

> **e.    Tenth Incident:    Ms. Mule's "Public" "Admonish[ment]" on a Community Zoom Meeting During the "2020–2021 School Year"**

- (10) Ms. Ross allegedly "continued to treat Plaintiff dismissively and disrespectfully throughout the 2020–2021 school year." (SAC ¶ 24.) Ms. Mule "was admonished publicly on a Zoom meeting for members of her school community [for] calling [the Administration for Children's Services] for a student they [*sic*] couldn't find during the Pandemic. This was viewed as racist by Janice Ross." (*Id.*) An unidentified person allegedly told Ms. Mule "that Black and Hispanic children needed Principals who looked like them so that they could feel represented and so that they would not be harmed by white educators who were assumed to be biased and racist." (SAC ¶ 25.)

Although the SAC does not identify Ms. Ross as the person who made all the foregoing statements in the Tenth Incident, the Court liberally construes the SAC to allege that Ms. Ross made the statements. The SAC does not expressly allege when the Tenth Incident occurred; however, the pertinent allegations are contained within or immediately follow paragraph 24 of the SAC, which refers to alleged conduct by Ms. Ross "throughout the 2020–2021 school year." (SAC ¶ 24.) Thus, the Court construes the SAC to allege that Ms. Ross publicly admonished Ms. Mule during a Zoom meeting that took place during the 2020–2021 school year.

**f.   Eleventh Incident: Ms. Ross's February 2022 Notice of Unauthorized Absence for Ms. Mule's Medical Leave**

▪ (11) On October 29, 2021, Ms. Mule "broke up a fight across from her office and became injured." (SAC ¶ 31.) Thereafter, Ms. Mule went on "line-of-duty-injury" (or "LODI") medical leave. (*See* SAC ¶ 60.) Ms. Mule returned to duty for several days beginning on or before December 13, 2021 (*see* SAC ¶ 39), and, on December 14, 2021, Ms. Mule "received a summons for a performance conference" from Ms. Ross's secretary (SAC ¶ 40). On December 17, 2021, Ms. Ross's secretary requested a medical evaluation from Ms. Mule. (SAC ¶ 42.) Ms. Mule went on medical leave again "from December 15, 2021, until on or about September 6, 2022." (*Id.*) During that period, on February 28, 2022, Ms. Ross notified Ms. Mule by email "that [Ms. Mule's] absences would be marked as unauthorized," as of an unspecified date. (SAC ¶ 44.)

**g.   Twelfth Incident: Ms. Ross Posted Ms. Mule's Private Medical Information on Twitter in 2022**

▪ (12) On November 30, 2022, Ms. Mule "received notice that the arbitrator denied her medical arbitration for LODI." (SAC ¶ 60.) Following the arbitrator's decision, Ms. Ross, allegedly posted Ms. Mule's private medical information on Twitter. (*Id.*)[1] "This was further retaliation due to [Ms. Mule] being a Caucasian principal that Ross wanted out of her position." (*Id.*)

**h.   Allegations of General or Repeated Conduct Attributed to Ms. Ross**

▪ On an unspecified date, Ms. Ross stated during a recorded Zoom meeting with principals that "anyone who did not accept" that "white culture [was] negative and harmful . . . could not work at Brooklyn North [High Schools]." (SAC ¶ 18.)

▪ Ms. Ross allegedly "has hired" or retained employees who "have engaged in harassment of Caucasian teachers and administrators," including Rushell White, Kyleema Norman, and Terrance Paulin. (SAC ¶ 19.)

---

[1]    In July 2023, Twitter was renamed X. *See* Ryan Mac & Tiffany Hsu, *From Twitter to X*, N.Y. Times (July 24, 2023), nytimes.com/2023/07/24/technology/twitter-x-elon-musk.html. Consistent with the Second Amended Complaint and the parties' briefs, the Court refers to the website as "Twitter" herein.

▪ The SAC alleges that "throughout the 2020–2021 school year," Ms. Ross "held several professional development sessions that dealt with race," and, "[a]t one session, the staff had to acknowledge that the United States is a racist country with original sin," that "white people are oppressive," and that "white people have an unearned privilege." (SAC ¶ 24.)

  o The SAC alleges that the "[p]rofessional learning sessions (2016–current) [*sic*] consist almost exclusively of black vendors who teach critical race ideology, including such presenters as Glenn Singleton and Gholdy Mohammed [*sic*]," and that these sessions "always centered around looking at education through the lens of oppression and privilege, with Caucasian educators blamed during the sessions for students' poor performance." (SAC ¶ 18.) The SAC alleges that "[p]rincipals were consistently asked to engage in conversations about race, based on the work of Glenn Singleton, to speak their truth[,] and [to] experience discomfort." (SAC ¶ 52.)

▪ "During monthly principal meetings, [Ms. Ross] told the principals that she hires based on race." (SAC ¶ 69.) Ms. Ross "maintains that school leaders need to reflect the demographics of the students." (*Id.*)

  o "Superintendent Ross has almost exclusively hired principals of color for the schools that she oversees as openings became available." (SAC ¶ 14.) The Second Amended Complaint names seventeen schools as "example[s]" of schools where Ms. Ross "hired all black and Hispanic principals." (SAC ¶ 15.) Ms. Ross allegedly "continued to hire only Blacks and Hispanics." (SAC ¶ 16.)

   **2.  Incidents Attributed to Individuals Other than Ms. Ross**

The Second Amended Complaint alleges additional incidents attributed to individuals other than Ms. Ross.

▪ In September 2021, Ms. Goldberg, "Director of Academic Access for Brooklyn North High Schools," told Ms. Mule "that as a white woman, Plaintiff needed to understand how her whiteness is a barrier to being a school leader" and "that black children need leaders who look like them." (ECF No. 20-4 at 4 (CM/ECF numbering); SAC ¶ 29.)

- On December 13, 2021, Mr. Paulin, "Chief Operations Officer [for] Brooklyn North High Schools," told Ms. Mule that "Dean Scala should not be the Dean as he cannot relate to the kids because he is white and Italian American and that Plaintiff needed to find someone of color to work with the students." (ECF No. 20-4 at 4 (CM/ECF numbering); SAC ¶ 39.) Subsequently, "Dean Scala was removed from the position of Dean by Acting Principal Rodriguez, and an African teacher replaced him even though she had complaints regarding verbal abuse of students." (SAC ¶ 39.)

- On June 28, 2022, an Equal Opportunity and Diversity Management (OEO) complaint was filed by Ms. Goldberg against Ms. Mule, allegedly because of Ms. Mule's "skin color and the fact that 'she did not belong' as a principal in a school where the student body was mainly Hispanic and African American . . . ." (*See* SAC ¶ 57.)  The June 28, 2022 OEO complaint alleged racial, gender, and sexual orientation discrimination by Ms. Mule, and further alleged posting of inappropriate materials through an anonymous Twitter account in violation of DOE Chancellor's Regulation A-830. (*See generally* ECF No. 20-3 (CM/ECF numbering).)

- The SAC alleges that "Plaintiff was subjected to disparate treatment as opposed to her counterparts who were African American and Hispanic by receiving less preferential treatment, by being isolated and not invited to meetings, and by having her career thwarted." (SAC ¶ 17.)  The SAC does not allege the disparate treatment Ms. Mule experienced, dates of the alleged disparate treatment, specific individual or individuals who were either similarly situated or who were responsible for the disparate treatment, or specific facts of "less preferential treatment," "being isolated and not invited to meetings," and "having [Ms. Mule's] career thwarted." (*Id.*)

**B.    The Alleged Retaliation**

As further described below, the SAC alleges that Ms. Mule suffered adverse employment actions in retaliation for her filing a June 9, 2022 OEO complaint against Ms. Ross alleging race discrimination, and in retaliation for Ms. Mule's tweets and

retweets.  Although she had used an anonymous Twitter account, Ms. Mule admits that she was responsible for the pertinent postings.

### 1.   Ms. Mule's June 9, 2022 OEO Complaint

On June 9, 2022, Ms. Mule filed a complaint with DOE's Office of Equal Opportunity and Diversity Management (OEO) against Ms. Ross, alleging race discrimination.  (SAC ¶ 49; *see also* ECF No. 20-4 at 6 (CM/ECF numbering) (noting that Ms. Mule "put in an OEO complaint" in June 2022 following a January 2022 report that she made to "SCI [Special Commissioner of Investigation] misconduct" concerning Ms. Ross).)  Ms. Mule's OEO complaint against Ms. Ross allegedly remains under investigation.  (SAC ¶ 49.)

The SAC alleges that "it [became] clear that Plaintiff was not allowed to put in [the] complaint" against Ms. Ross, when, during Ms. Mule's May 2023 interview for "a higher position at Tweed," "the investigator" told Ms. Mule "to speed up her responses and that she only had 1 hour for the interview."  (SAC ¶¶ 45, 49.)  Ms. Mule does not allege whether others applying to the same position were given more or less than one hour to interview.

### 2.   The June 28, 2022 OEO Complaint Against Ms. Mule

On June 28, 2022, DOE's Office of Equal Opportunity and Diversity Management (OEO) received a complaint against Ms. Mule "alleging racial, gender, and sexual orientation discrimination, which alleged that Plaintiff, through an anonymous Twitter account, posted inappropriate materials."  (SAC ¶ 57.)  The OEO

complaint against Ms. Mule was filed by Ms. Goldberg.  (ECF No. 20-3 at 2 (CM/ECF numbering).)  The SAC alleges that the June 28, 2022 OEO complaint was "a pretext" and, in fact, "was motivated by Plaintiff's skin color and the fact that 'she did not belong' as a principal in a school where the student body was mainly Hispanic and African American and in retaliation for her EEO activity." (SAC ¶ 57.)  The SAC alleges that the purpose of the OEO complaint against Ms. Mule was to remove her "from her position and replace her with Acting Principal Elizabeth Rodriguez, a person of color who is not a licensed teacher but rather a guidance counselor and an assistant principal of guidance."  (SAC ¶ 61.)

The SAC alleges that "[i]n July 2022, the Superintendent removed Plaintiff's access to her emails."  (SAC ¶ 58.)  On September 6, 2022, allegedly due to the pending the OEO investigation against Ms. Mule, she was reassigned to clerical duties, "such as answering the telephone and greeting visitors." (SAC ¶ 59.)  On "May 17, 2023, OEO interviewed Plaintiff concerning the complaint against her that led to her reassignment."  (SAC ¶ 61.)  After interviewing for the position of Senior Director of High School Instructional Support in April 2023, Ms. Mule was subsequently informed that she could not be hired due to the pending OEO investigation.  (SAC ¶ 65.)

"On or about June 8, 2023," after an allegedly "flawed investigation driven entirely by" Ms. Ross and Ms. Goldberg, "and

absent any victims or school community environment [*sic*] that was made toxic by the alleged tweets, OEO substantiated the allegations against Plaintiff, finding that she had created a hostile environment based on race, gender, and sexual orientation in violation of [DOE] Chancellor's Regulation A-830." (SAC ¶ 62; *see also* ECF No. 20-3.)[2] "As a result of the substantiated finding," Ms. Mule "is no longer eligible for per-session work, such as

---

[2]    The text of Chancellor's Regulation A-830 is not alleged in the Second Amendment Complaint.    The Court takes judicial notice, however, that Chancellor's Regulation A-830 includes the following pertinent provision:

> 4. It is a violation of this regulation for any DOE employee to discriminate against or create a hostile school environment for a student by conduct, whether on school property/DOE facilities, during a DOE program or activity, including online learning/working, on the basis of [race, color, religion, age, creed, ethnicity, national origin, alienage, citizenship status, disability, sexual orientation, gender, or weight], including sexual harassment (as defined in Section IX), where such conduct: (1) has or would have the effect of unreasonably and substantially interfering with a student's ability to participate in or benefit from an educational program, school-sponsored activity or any other aspect of a student's education; or (2) has or would have the effect of unreasonably and substantially interfering with a student's mental, emotional or physical well-being; or (3) reasonably causes or would reasonably be expected to cause a student to fear for their physical safety; or (4) reasonably causes or would be expected to cause physical injury or emotional harm to a student. **It is also a violation of this regulation for any DOE employee to engage in the conduct noted above off school property/DOE facilities when such conduct disrupts or would foreseeably disrupt the educational process or endangers or would foreseeably endanger the health, safety, morals, or welfare of the school community.**

Chancellor's Regulation A-830, § I.B.4 (Oct. 19, 2023), schools.nyc.gov/docs/default-source/default-document-library/a-830.pdf (emphasis added).

supervising afterschool activities, which has resulted in losing thousands of dollars of income" and "permanently changed [her] income, responsibilities, and possibility of further advancement." (SAC ¶ 63; *see also* SAC ¶ 64 (alleging Ms. Mule is not eligible for promotion to specific positions due to the substantiated allegations).) Ms. Mule does not allege whether she has sought further review of or has challenged the substantiated OEO findings or its consequences.

Ms. Rodriguez replaced Ms. Mule as principal and allegedly "continues the discriminatory practices targeting Caucasian educators at the school." (SAC ¶ 70.) "Several Caucasian teachers have transferred to other schools . . . and told Plaintiff it was due to the harassment and discrimination." (*Id.*)

### 3.    Tweets Included in the June 8, 2023 OEO Report on the OEO Complaint Against Ms. Mule

Ms. Mule maintained an "anonymous Twitter account," referred to as "People Of Integrity," which identified its owner as an "'NYC parent' and a 'principal of a small high school.'" (SAC ¶ 48; ECF No. 20-3 at 1–2 (CM/ECF numbering).)

As determined in the June 8, 2023 report substantiating the June 28, 2022 OEO complaint against Ms. Mule, Ms. Mule used her anonymous Twitter account to post several tweets or retweets,[3] four

---

[3]    Retweeting refers to "sharing another person's post." Kate Conger, *So What Do We Call Twitter Now Anyway?*, N.Y. Times (Aug. 3, 2023), nytimes.com /2023/08/03/technology/twitter-x-tweets-elon-musk.html.

of which—a June 20, 2022 tweet and three undated tweets and retweets—were found to violate the Chancellor's regulations. The four tweets are described below.

On June 20, 2022, Ms. Mule used her "anonymous Twitter account" to post the following:

> (1)    I'm against screen schools. However, there is some truth to some of what parents are saying. Doe [*sic*] schools are underfunded even though the system is overfunded. And most schools with large numbers of brown and black students are underperforming.
>
> Culturally, generally speaking, black and brown families [are] not as invested in children's education, promote/excuse very poor behavior[,] and exhibit poor effort/interest in children's education. Students exhibit poor effort. Black and brown families look for screened schools too.

(SAC ¶ 51.) Ms. Mule allegedly posted the above in response to the following tweet from "Jeremy Chan-Kraushar, the Director of Equity and Access" at the DOE's Office of Equity and Access:

> Coded language BINGO when admission policies shift (even a tiny bit) toward integration:
> "Merit-based",
> "Hard work",
> "Poor schools",
> "Dangerous neighborhoods",
> "Emotional trauma" & "devastation" of kids not getting their select school over generational neglect for Black/brown Ss.

(SAC ¶¶ 50, 52.) Allegedly, Mr. Chan-Kraushar "consistently stated that white parents and Asian parents at the DOE are racist and do not want their children with black students." (SAC ¶ 52.)

14

Ms. Mule's June 20, 2022 tweet was, as alleged, "plaintiff's way of conversing about race with a fellow DOE member" as "[p]rincipals were consistently asked to" do. (*Id.*) Ms. Mule further alleges that her June 20, 2022 tweet "was based on the data shared by [Ms.] Ross and her team" concerning rates of absenteeism and suspension. (SAC ¶ 53.)

The June 8, 2023 OEO report attributes three other undated tweets and retweets to Ms. Mule's "anonymous Twitter account," which the OEO report found violated the Chancellor's regulations:

> (2)    In an undated tweet, @PeopleforInteg1 wrote, "My older child is leaving the system next year for high school, and if they continue to teach that white people are racist and crazy LGBTQ stuff, I will take him and myself out too."

> (3)    In a[nother] tweet[,] on an unknown date, @PeopleforInteg1 retweeted, without comment, a tweet by an individual identified as Jennifer Moore that stated, "When did gay rights go from 'get out of my bedroom' to 'celebrate us for an entire month in public schools'?"

> (4)    On an unknown date and without comment, @PeopleforInteg1 retweeted a tweet by "some angry dude" which stated, "Nobody is promoting violence against queer folk. They don't agree there should be a drag queens story hour in grade school. How is this even a thing? We should focus on academics since a ton of [money bag emoji] gets poured into schools but we're behind the rest of the world in education."

(ECF No. 20-3 at 3 (CM/ECF numbering) (final alteration in original; citations and footnotes omitted).)[4]

### 4. Tweets Omitted from June 8, 2023 OEO Report

Ms. Mule allegedly posted the following four additional tweets, dated between January 24, 2020 and September 28, 2022:

> "On or about January 24th, 2020 [*sic*]. Tara Christie Kinsey stated An [*sic*] @NPRCodeSwitch podcast cites that 75% of white Americans have entirely white social networks. Research shows attending a diverse school has profound impact on people having heterogenous friend groups in life 2 proud [*sic*].

> "On or about March 7th, 2022 [*sic*]. Ana Marie [*sic*] Mule stated As [*sic*] a system, there is no reason to have overcrowded screened schools and under[-]enrolled schools serving students that the screened schools don't want. Make schools academically heterogeneous and reap the rewards. @Realdavidcbanks @NYCMayor[.]

> "On or about March 7th, 2022 [*sic*]. Press NYC stated If [*sic*] you are not hearing what[']s written here from the parents you are talking to, you have not talked to enough parents, @DOEChancellor.

> "On or about September 28th, 2022 [*sic*]. Ana Marie [*sic*] Mule stated The [*sic*] admission algorithm for [high school] is not being utilized properly. Remove all screens and gifted and talented programs and make schools heterogenous in terms of demographic[s], academic ability[,] and

---

[4]     The June 8, 2023 OEO report includes additional tweets from Ms. Mule's personal and anonymous Twitter accounts. (*See* ECF No. 20-3 at 4–5 (CM/ECF numbering).) These additional tweets are cited by the report to support its conclusion that Ms. Mule was responsible for the anonymous Twitter account, but the additional tweets were not "identified" as "potential violations of Chancellor's Regulation A-830." (*Id.* at 3.)

poverty.  Reduce all schools to no more than 2500 students included [*sic*] the specialized."

(SAC ¶ 54 (reordered chronologically).)  Moreover, another tweet from Ms. Mule's anonymous Twitter account was allegedly linked in an April 3, 2022 New York Post article concerning "[t]he citywide rate of chronic absenteeism among NYC public-school students." (SAC ¶ 47.)  The tweet linked in the April 3, 2022 New York Post article stated, "Terrance Paulin at [Brooklyn North High Schools] [is] providing 'instructions' on how to raise attendance rates by asking schools to look for COVID absences that can be changed to present.  Students had excused absences.  Why inflate atten. [*sic*]?   @SusabBEdelman     @ChalkbeatNY     @MichaelElsenRoo @BobHoldenNYC."  (SAC ¶ 48.)

## II.  Procedural History

On May 30, 2023, Ms. Mule filed a charge with the New York State Division of Human Rights alleging unlawful employment practices "because of national origin, race/color, opposed discrimination/retaliation."  (ECF No. 20-4 at 2 (CM/ECF numbering).)  Ms. Mule was granted the right to sue within 90 days of November 16, 2023.  (ECF No. 20-5.)

On February 9, 2024, Ms. Mule commenced an action in state court against the Department of Education, the Board of Education, Ms. Goldberg, and Ms. Ross.  (ECF No. 1-2 (state court summons and

17

complaint)).  On March 20, 2024, Defendants removed the action to this Court.  (ECF No. 1.)

On May 24, 2024, Ms. Mule filed her first amended complaint. (ECF No. 11.)  On July 17, 2024, Ms. Mule filed her Second Amended Complaint, alleging (1) "retaliat[ion] for complaining about her race (Caucasian) discrimination," and (2) First Amendment retaliation via "depriv[ation] of her Federal rights under 42 U.S.C. [§] 1983 and the Fourteenth Amendment."  (SAC ¶¶ 1, 86.) On November 18, 2024, the parties filed their moving papers in connection with Defendants' motion to dismiss the Second Amended Complaint.  (ECF Nos. 19–23.)

## LEGAL STANDARDS

### I.  Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Cardinal Motors, Inc. v. H&H Sports Prot. USA Inc.*, 128 F.4th 112, 120 (2d Cir. 2025) (internal quotation marks omitted).  In assessing whether challenged allegations meet this standard, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Buon v. Spindler*, 65 F.4th 64, 76 (2d Cir. 2023) (alteration adopted) (first quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## II.  Pleading Requirements for Plaintiff's Claims

### A.  Claim for Retaliation in Violation of Title VII

For a Title VII retaliation claim to survive a motion to dismiss, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against h[er], (2) 'because' [s]he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015).  A "claim of retaliatory hostile work environment" under Title VII "must [] be treated identically to a claim that an employer took multiple retaliatory actions that were, in the aggregate, materially adverse."  *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 179-80 (2d Cir. 2023) (internal quotation marks omitted).  Retaliatory hostile work environment claims are not subject to the same "severe and pervasive" standard as race-based hostile work environment claims but are instead assessed to determine whether the allegedly retaliatory actions, "taken in the aggregate, are materially adverse and would dissuade a reasonable employee from making a complaint of discrimination."  *Stanley v. Mount Sinai Health Sys., Inc.*, No. 21-cv-4619, 2023 WL 8355393, at *11 n.20 (S.D.N.Y. Dec. 1, 2023) (quoting *Carr*, 76 F.4th at 181).

## B.   Claim for Retaliation in Violation of the First Amendment

For a public-employee plaintiff's First Amendment retaliation claim to survive a motion to dismiss, she must allege: "(1) that [s]he engaged in activity protected by the First Amendment; (2) that [s]he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Smith v. City of N.Y.*, 130 F. Supp. 3d 819, 831 (S.D.N.Y. 2015) (citing *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015); *Winters v. Meyer*, 442 F. Supp. 2d 82, 86–87 (S.D.N.Y. 2006)); *accord Heim v. Daniel*, 81 F.4th 212, 221 (2d Cir. 2023).

## ANALYSIS

### I.  JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 42 U.S.C. § 2000e-5(f)(3).

### II.  CLAIMS

Ms. Mule brings only two claims in the Second Amended Complaint: (1) a Title VII retaliation claim under the heading "**AS AND FOR THE FIRST CLAIM FOR RELIEF TITLE VII DOE ONLY [*sic*] - RETALIATION**" and (2) a First Amendment retaliation claim under the heading "**AS AND FOR THE SECOND CLAIM FOR RELIEF ALL DEFENDANTS [*sic*] - FIRST AMENDMENT.**" (*See* SAC ¶¶ 74–87 (emphasis retained).) Thus, the SAC does not purport to bring Title VII claims for discrimination or hostile work environment based on race. *See*

*Brokamp v. James*, 66 F.4th 374, 390 n.15 (2d Cir. 2023) ("the party who brings a suit is master to decide what law [s]he will rely upon" (citation omitted)); *see also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332–33 (S.D.N.Y. 2003) (limiting claims to those which were "highlight[ed] . . . with headings that [we]re bolded, underlined, and capitalized").

The Court first addresses the basis for dismissing any purported Title VII discrimination or hostile work environment claim based on race, if such claims had been included in the SAC. First, the SAC fails to state a Title VII discrimination claim based on race because it fails to plausibly allege discriminatory intent and, in fact, alleges that any *timely* adverse employment actions were due to the June 28, 2022 OEO complaint against Ms. Mule and its subsequent substantiation. *See Buon*, 65 F.4th at 78–79, 83 ("[T]o properly assert a claim of discrimination against an employer under Title VII, a plaintiff must . . . plausibly allege she suffered an adverse employment action . . . at least in part for a discriminatory reason, and she may do so by either alleging facts that *directly* show discrimination *or* facts that *indirectly* show discrimination by giving rise to a plausible inference of discrimination." (alterations adopted) (quoting *Vega*, 801 F.3d at 85, 87)); *Wilson v. New York*, No. 15-cv-23(CBA)(VMS), 2017 WL 9674497, at *12 (E.D.N.Y. Jan. 24, 2017) (finding plaintiff failed to plausibly allege disciplinary proceedings were initiated due to

his race where he alleged the disciplinary proceedings were instead based on accusations of theft), *report and recommendation adopted*, 2018 WL 1466770 (E.D.N.Y. Mar. 26, 2018); *accord Bockus v. Maple Pro, Inc.*, 850 F. App'x 48, 50–51 (2d Cir. 2021) ("threadbare allegations [of discriminatory intent] cannot sustain even the 'minimal burden' of raising an inference that [an employer] was motivated by discriminatory intent" (citing *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015))).

Moreover, Ms. Mule abandoned her Title VII race discrimination claim after including it in her first amended complaint ("FAC") but omitting it from her Second Amended Complaint. (*Compare* ECF No. 11 (FAC) ¶¶ 1, 72–75 (alleging one Title VII claim "based on [Ms. Mule's] race, and retaliation" and alleging a second Title VII claim "based on retaliation" only), *with* ECF No. 14 (SAC) ¶¶ 1, 74–75 (alleging a single Title VII claim "based on retaliation" only)).  "It is long held in this Circuit that any claims included in the original complaint that are omitted from the amended complaint are considered abandoned . . . ." *Toussaint v. City of N.Y.*, No. 19-cv-1239(AT), 2021 WL 4429316, at *3 n.3 (S.D.N.Y. Sep. 27, 2021) (internal quotation marks and citation omitted); *accord Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998) ("ordinarily it makes perfect sense to hold that a party who seeks to file an amended pleading that omits a claim intends to abandon the claim"),

*abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also Ping Tou Bian v. Taylor*, 23 F. App'x 75, 76–77 (2d Cir. 2001) (noting plaintiff abandoned assault and battery claim that was included in initial complaint but not in amended complaint).

Second, the SAC fails to state a Title VII hostile work environment claim based on race because it fails to allege incidents which together are sufficiently hostile or pervasive. In considering whether a plaintiff has stated a hostile work environment claim, courts look to "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Sealy v. State Univ. of N.Y.*, 834 F. App'x 611, 615 (2d Cir. 2020) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009)). "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (alteration adopted) (internal quotation marks and citations omitted). Only incidents attributed to Ms. Mule's supervisor, Ms. Ross, are imputed to the

City Defendants.  (ECF No. 20-3 at 4 (CM/ECF numbering) (Ms. Mule's "supervisor was Superintendent Ross").)  An employer "may be held strictly liable for" the actions of a supervisor, but is liable for the conduct of a non-supervisor only where the employer, unlike here, is alleged to have been negligent.  *Lekettey v. City of N.Y.*, 637 F. App'x 659, 662 (2d Cir. 2016) (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)).

Here, "[i]n the aggregate," the incidents attributable to the City Defendants, even if all are considered part of the same course of conduct, "do not amount to a pervasive hostile work environment." *Pattanayak v. Mastercard Inc.*, No. 22-1411, 2023 WL 2358826, at *4 (2d Cir. Mar. 6, 2023); *accord Alfano v. Costello*, 294 F.3d 365, 379–80 (2d Cir. 2002) (collecting cases where "evidence was held insufficient as a matter of law to alter the terms and conditions of employment" including one case, *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261–63 (10th Cir. 1998), in which many incidents of alleged sexual harassment occurred in a three-year period); *Penry*, 155 F.3d at 1260–61 (enumerating sixteen distinct incidents of alleged sexual harassment including certain conduct that repeated with unspecified frequency); *see Sealy*, 834 F. App'x at 615–16 (nine hostile incidents over an approximately one-year period, including one incident where plaintiff's supervisor "tore down a poster of President Obama" and "launched into a racially hostile rant" did not constitute a

hostile work environment); *Littlejohn*, 795 F.3d at 321 (affirming dismissal of hostile work environment claim because nine hostile incidents over 33-month period were insufficiently "severe or pervasive as to have altered the conditions of [plaintiff's] employment"); *Stanley v. Phelon*, No. 23-731, 2024 WL 1453872, at *3-4 (2d Cir. Apr. 4, 2024) (affirming dismissal of hostile work environment claim because at least thirteen hostile incidents over an approximately five-year period, including a negative performance evaluation making express reference to plaintiff's protected characteristics, "were not sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment" (internal quotation marks omitted)); *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 781-82 (S.D.N.Y. 2019) (dismissing hostile work environment claim based on four assertedly racist incidents during a one-year period); *Johnson v. City of N.Y.*, No. 23-cv-6804(ER), 2024 WL 4336317, at *9-10 (S.D.N.Y. Sep. 27, 2024) (dismissing hostile work environment claim based on nine offensive actions during a two-year period); *Martin v. City Univ. of N.Y.*, No. 17-cv-6791(KPF), 2018 WL 6510805, at *8-9, *12 (S.D.N.Y. Dec. 11, 2018) (dismissing hostile work environment claim based on four assertedly racist comments during an approximately one-year period).

The Court now turns to the two claims purportedly alleged in the Second Amended Complaint.

## III.  DISCUSSION

### A.  Title VII Retaliation (First Claim)

The SAC fails to allege a plausible Title VII retaliation claim—whether based on individual adverse actions or based on the work environment as a whole—for the incidents following Ms. Mule's protected act of filing her June 9, 2022 OEO complaint.[5]

Title VII makes it unlawful "'for an employer to discriminate against any employee because that individual opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII investigation or proceeding." *Littlejohn*, 795 F.3d at 315 (alterations adopted) (quoting 42 U.S.C. § 2000e-3(a)).  "[F]or a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against h[er], (2) 'because' [s]he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90.

#### 1.  Adverse Employment Action

For purposes of a Title VII retaliation claim, an "adverse employment action" is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."

---

[5]    Ms. Mule's retaliation claims are analyzed together, "because 'a claim of 'retaliatory work environment' must be treated identically to a claim that an employer took multiple retaliatory actions that were, in the aggregate, 'materially adverse.'"    *Jones v. Brookhaven Sci. Assocs., LLC*, No. 23-cv-4194(NJC)(ARL), 2024 WL 4145777, at *10 n.9 (E.D.N.Y. Sep. 10, 2024) (alterations adopted) (quoting *Carr*, 76 F.4th at 180).

*Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)). "[T]he significance of any given act of retaliation will often depend upon the particular circumstances" of each case, and an "act that would be immaterial in some situations is material in others." *White*, 548 U.S. at 69 (citation omitted).

In the education context, "[t]he Second Circuit has found that 'negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, [and] transfer from library to classroom teaching . . .' may qualify as adverse employment actions for purposes of a retaliation claim." *Herling v. N.Y.C. Dep't of Educ.*, No. 13-cv-5287(JG), 2014 WL 1621966, at *9 (E.D.N.Y. Apr. 23, 2014) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006)).

Allegations in the SAC that occurred before Ms. Mule filed her OEO complaint against Ms. Ross on June 9, 2022 offer no support for Ms. Mule's Title VII retaliation claim. *See, e.g.*, *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014); *see also Moy v. Perez*, 712 F. App'x 38, 40 (2d Cir. 2017) (retaliation claim failed because allegedly retaliatory conduct occurred before plaintiff's protected employment action).[6]

---

[6]    Defendants appear to argue that Ms. Mule's Title VII claims are untimely, yet admit that no fewer than four "potential adverse actions" occurred that

Here, nineteen days after Ms. Mule engaged in protected activity by filing her OEO complaint against Ms. Ross on June 9, 2022,[7] Ms. Goldberg, "Director of Academic Access for Brooklyn North High Schools," filed, on June 28, 2022, an OEO complaint against Ms. Mule "alleging racial, gender, and sexual orientation discrimination," based on the specific allegation "that Plaintiff, through a[] [then-]anonymous Twitter account, posted inappropriate materials" in violation of "Chancellor's Regulation A-830." (SAC ¶¶ 49, 57, 62; ECF No. 20-4 at 4 (CM/ECF numbering); *see also* ECF No. 20-3 at 2 (CM/ECF numbering).) Due to the investigation that followed the filing of Ms. Goldberg's June 28, 2022 OEO complaint, Ms. Mule was reassigned to clerical duties on September 6, 2022 and allegedly "could not [be] hire[d]" for a new position to which she had recently applied. (SAC ¶¶ 59, 65.) In November 2022, after an arbitrator denied Ms. Mule's request for LODI medical leave, Ms. Ross posted Ms. Mule's private medical information on Twitter. (*See* SAC ¶ 60.) After the Goldberg OEO complaint against Ms. Mule was substantiated nearly a year later, on June 8, 2023,

---

could support Ms. Mule's Title VII claims. (*See* ECF No. 21 at 9.) Thus, as Defendants apparently concede, none of Ms. Mule's claims appear untimely on the face of the SAC. *See Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999) ("in the statute of limitations context," dismissal is warranted "only if a complaint clearly shows the claim is out of time").

[7] Ms. Mule's June 9, 2022 OEO complaint alleging race discrimination against Ms. Ross (*see* SAC ¶ 49), constitutes protected activity for purposes of Title VII. *See, e.g., Arkorful v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 3d 336, 357 (E.D.N.Y. 2024) ("There is no dispute that filing an OEO Complaint is a protected activity, nor that the employer was aware of the activity.").

Ms. Mule allegedly suffered the loss of "thousands of dollars of income" due to her ineligibility for per-session work such as supervising afterschool activities, and her career was "thwart[ed]" as a result of being ineligible for "promotional opportunities." (*See* SAC ¶¶ 62-64.)

In the aggregate, the acts of retaliation alleged in the SAC, including Ms. Mule's reassignment to clerical duties on September 6, 2022, Ms. Ross's posting of Ms. Mule's personal medical information to Twitter on November 30, 2022, and Ms. Mule's failure to be promoted to the position of "Senior Director of High School Instructional Support" following an April 2023 interview, could deter a reasonable person from complaining about discrimination. (SAC ¶ 65); *see Herling*, 2014 WL 1621966, at *9; *Duling v. Gristede's Operating Corp.*, 266 F.R.D. 66, 72-74 (S.D.N.Y. 2010); *Raymond v. City of N.Y.*, 317 F. Supp. 3d 746, 773 (S.D.N.Y. 2018) (citing *Zelnik*, 464 F.3d at 226).[8]

### 2.  Causation

Turning to the second element, "[t]he requisite causation 'may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity.'" *Canady v.*

---

[8]    In contrast, because Ms. Mule fails to allege that she applied for per-session work, her ineligibility to perform per-session work does not constitute an adverse employment action. *See Giordano-Forkan v. N.Y.C. Dep't of Educ.*, No. 13-cv-6950(GBD), 2014 WL 5369426, at *3 n.2 (S.D.N.Y. Oct. 17, 2014); *Silva-Markus v. N.Y.C. Dep't of Educ.*, No. 19-cv-4335(PGG)(SLC), 2022 WL 736425, at *8 (S.D.N.Y. Mar. 11, 2022).

*Univ. of Rochester Strong Mem'l Med. Ctr.*, No. 21-2150, 2022 WL 17825332, at *2 (2d Cir. Dec. 21, 2022) (quoting *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 307 (2d Cir. 2021)). To meet this standard, a Title VII retaliation "plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). Ms. Mule fails plausibly to allege that retaliation was the "but for" cause of her employer's adverse action; dismissal of her Title VII retaliation claim is therefore warranted.

Although at least one adverse employment action alleged in the SAC—Ms. Mule's September 6, 2022 reassignment to clerical duties—closely followed the June 9, 2022 filing of Ms. Mule's OEO complaint, temporal proximity alone may be insufficient to establish causation. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (noting courts may exercise "judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases" (citations omitted)). Here, the allegation of temporal proximity between Ms. Mule's protected act and the retaliatory adverse action fails to state sufficient facts for causation because the SAC alleges that adverse employment actions were taken not because of Ms. Mule's June 9, 2022 OEO complaint, but instead were taken as a result of Ms. Goldberg's June 28, 2022 OEO complaint against Ms. Mule, which itself was

based, in part, on Ms. Mule's June 20, 2022 tweet.  Ms. Mule's June 20, 2022 tweet stated, *inter alia*, Ms. Mule's view that "black and brown families [are] not as invested in children's education, promote/excuse very poor behavior[,] and exhibit poor effort/interest in children's education." (SAC ¶ 51.)  Moreover, as alleged in the SAC, the Goldberg OEO complaint was initiated, and later substantiated, for non-retaliatory, legitimate reasons, i.e., that Ms. Mule "created a hostile environment based on gender, race, and sexual orientation in violation of Chancellor's Regulation A-830." (ECF No. 20-3 at 5 (CM/ECF numbering); SAC ¶¶ 57, 62.)

Where a legitimate and nonretaliatory reason for Defendants' actions is alleged in the SAC, (*see* SAC ¶ 62 (alleging OEO complaint was substantiated based on a finding that Ms. Mule had violated Chancellor's Regulations A-830); *see also* SAC ¶¶ 79, 84 (alleging "[t]he only reason for" alleged retaliation was Ms. Mule's "communication on Twitter" as opposed to any protected employment activity)), the Court need not credit conclusory and implausible allegations that the Goldberg OEO complaint was also "in retaliation for [Ms. Mule's] EEO activity." (SAC ¶ 57); *see Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of [plaintiff's] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *Walker v. Senecal*, 130 F.4th 291, 300 (2d Cir. 2025)

("allegations of plausible non-retaliatory reasons [for adverse action] reinforce the lack of plausible allegations of retaliation"); *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 171 (2d Cir. 2024) ("[R]ather than show [plaintiff] was terminated because of [plaintiff's] protected activity, the allegations in the Complaint make clear that [plaintiff] was fired because of [plaintiff's] failure to comply with the company-wide [] policy. Because the policy applied to all employees regardless of whether they had engaged in protected activity, [plaintiff] has not plausibly pleaded a connection between h[er] invocations of [employment law] and [plaintiff's] termination.").

Moreover, based on Ms. Mule's allegations in the SAC, the Court respectfully rejects any conclusory allegation that the filing of Ms. Goldberg's June 28, 2022 OEO complaint was itself a retaliatory action in response to Ms. Mule's June 9, 2022 OEO complaint against Ms. Ross. The SAC alleges no facts plausibly explaining why Ms. Goldberg, who was not alleged to be a discriminatory official in Ms. Mule's June 9, 2022 OEO complaint, would be motivated to retaliate against Ms. Mule because of Ms. Mule's OEO complaint. *See Walker*, 130 F.4th at 299 ("when the grievance d[oes] not involve the defendant . . . we require further allegations to plausibly establish retaliatory animus" (citation omitted)).

Accordingly, Defendants' motion to dismiss Ms. Mule's Title VII retaliation claim is **GRANTED**.

**B.   First Amendment Retaliation (Second Claim)**

As explained below, the Court finds that the SAC fails to allege a plausible First Amendment retaliation claim.

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 200 (2d Cir. 2010) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138, 147 (1983)). For a public-employee plaintiff's First Amendment retaliation claim to survive a motion to dismiss, she must allege that: (1) she "engaged in activity protected by the First Amendment"; (2) she "suffered an adverse employment action"; and (3) "there was a causal connection between the protected activity and the adverse employment action." *Smith v. City of N.Y.*, 130 F. Supp. 3d at 831 (citing *Smith v. County of Suffolk*, 776 F.3d at 118; *Winters*, 442 F. Supp. 2d at 86–87); *accord Heim*, 81 F.4th at 221. Any First Amendment interest of the employee "must be balanced against the countervailing interest of the government in the effective and efficient management of its internal affairs." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011); *see also Piscottano v. Murphy*, 511 F.3d 247, 271 (2d Cir. 2007) (noting that public employer may defeat liability by

33

showing its adverse employment action was justified by countervailing interests (citing *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 466 (1995))).

For the reasons set forth below, even if certain of Ms. Mule's tweets and retweets may constitute activity protected by the First Amendment for which she has suffered adverse employment actions, any First Amendment interest Ms. Mule had in posting the tweets and retweets is outweighed by her employer's "countervailing interest," *Guarnieri*, 564 U.S. at 398, in "maintaining efficiency, discipline, and integrity, preventing disruption of operations, and avoiding having the judgment and professionalism of the [employer] brought into serious disrepute." *Piscottano*, 511 F.3d at 271 (citing *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion)). Dismissal of Ms. Mule's First Amendment retaliation claim is therefore warranted.

### 1. Constitutionally Protected Activity

As to the first element, whether a plaintiff has engaged in constitutionally protected activity, "[t]he First Amendment only protects a public employee's speech when 'the employee speaks as a citizen on a matter of public concern.'" *Smith v. City of N.Y.*, 130 F. Supp. 3d at 831 (alteration adopted) (quoting *Garcetti*, 547 U.S. at 418). In determining whether the plaintiff was speaking as a private citizen or public employee, courts ask whether "the speech f[e]ll[] outside of the employee's 'official

34

responsibilities'" and whether "a civilian analogue exist[s]."
*Id.* (quoting *Matthews v. City of N.Y.*, 779 F.3d 167, 173 (2d Cir.
2015)).  And in determining whether the plaintiff was speaking on
a matter of public concern, courts consider whether, in light of
the speech's "content, form, and context," it "can be fairly
considered as relating to any matter of political, social, or other
concern to the community, or that is a subject of legitimate news
interest; that is, a subject of general interest and of value and
concern to the public."  *Id.* (alteration adopted) (first quoting
*Connick*, 461 U.S. at 147; and then quoting *Lane v. Franks*, 573
U.S. 228, 241 (2014)).

As noted above, the June 8, 2023 OEO report substantiated the
June 28, 2022 OEO complaint against Ms. Mule and found that the
following four tweets and retweets that Ms. Mule had posted using
her then-anonymous Twitter account were "violations of
Chancellor's Regulation A-830."  (ECF No. 20-3 at 3 (CM/ECF
numbering)):

- ▪ (1) A June 20, 2022 tweet stating, "Culturally, generally
  speaking, black and brown families [are] not as invested in
  children['s] education, promote/excuse very poor behavior[,]
  and exhibit poor effort/interest in children's education.
  Students exhibit poor effort.  Black and brown families look
  for screened schools too."  (ECF No. 20-3 at 3 (CM/ECF
  numbering); SAC ¶ 51.)

- ▪ (2) An undated tweet stating, "My older child is leaving the
  system next year for high school, and if they continue to
  teach that white people are racist and crazy LGBTQ stuff, I
  will take him and myself out too." (ECF No. 20-3 at 3 (CM/ECF
  numbering).)

35

- (3) An undated retweet of an underlying tweet stating, "When did gay rights go from 'get out of my bedroom' to 'celebrate us for an entire month in public schools'?" (ECF No. 20-3 at 3 (CM/ECF numbering) (footnote omitted).)

- (4) An undated retweet of an underlying tweet stating, "Nobody is promoting violence against queer folk. They don't agree there should be a drag queens story hour in grade school. How is this even a thing? We should focus on academics since a ton of [money bag emoji] gets poured into schools but we're behind the rest of the world in education." (ECF No. 20-3 at 3 (CM/ECF numbering) (alteration in original; footnote omitted).)

The SAC also alleges that Ms. Mule's First Amendment rights were violated due to retaliation she suffered for posting the following tweet, concerning DOE's attendance policy, linked in an April 3, 2022 New York Post article:

- (5) An undated tweet stating, "Terrance Paulin at [Brooklyn North High Schools] [is] providing 'instructions' on how to raise attendance rates by asking schools to look for COVID absences that can be changed to present. Students had excused absences. Why inflate atten. [*sic*]? @SusabBEdelman @ChalkbeatNY @MichaelElsenRoo @BobHoldenNYC." (SAC ¶¶ 47–48, 79.)

For the reasons stated below, the Court finds that four of the five enumerated tweets and retweets by Ms. Mule arguably constitute constitutionally protected speech for which Ms. Mule suffered an adverse employment action, but that Ms. Mule's First Amendment claim nonetheless fails because her employer's countervailing interests in the efficient and effective management of its internal affairs justify the employer's actions.

### a.  Speaking as a Private Citizen

For reasons set forth below, the Court finds, with the exception of Ms. Mule's June 20, 2022 tweet, that Ms. Mule was speaking as a private citizen when posting anonymous tweets from her "People Of Integrity" Twitter account.

First, as Ms. Mule contends, and Defendants do not dispute, Ms. Mule's "job responsibilities did not include posting to a Twitter account anonymously." (ECF No. 22 at 21; *see generally* ECF Nos. 21 & 23.)  Defendants also do not assert that Ms. Mule's tweets, under a pseudonymous Twitter account identifying itself as an "NYC parent" and a "principal of a small high school," furthered her official duties as a high school principal. (*See generally* ECF Nos. 21 & 23.)  Instead, Defendants contend that because Ms. Mule identified herself in her Twitter account as a "principal of a small high school," her tweets from the account must have been posted in the course of her official duties. (ECF No. 21 at 21; *see* ECF No. 20-3 at 2 (CM/ECF numbering).)

Ms. Mule did not post each tweet on her account as a public employee merely because she identified her job title on her Twitter profile. *See, e.g.*, *Jackler v. Byrne*, 658 F.3d 225, 231, 241-42 (2d Cir. 2011) (holding employee spoke as private citizen where employee identified himself by name and title, i.e., "I, OFFICER JACKLER . . . ," in report describing events observed on duty); *Matthews*, 779 F.3d at 169-70, 174 (holding police officer spoke as

37

private citizen where officer spoke to supervisor in person on "precinct-wide policy").

Moreover, controlling authority compels the conclusion that Ms. Mule's tweets did not lose constitutional protection merely because they relied on and discussed her views based on information learned during the course of her employment, including "data shared by [Ms.] Ross." (SAC ¶ 53); *see Lane*, 573 U.S. at 239 (reversing circuit court; holding public employee's speech did not lose First Amendment protection because he "learned of the subject matter of his [speech] in the course of his employment"); *see also id.* at 240 ("In other words, the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."); *Long v. Byrne*, --- F.4th ---, No. 24-3080, 2025 WL 2151282, at *1, *10-11 (2d Cir. July 30, 2025) (court clerk's production of case files in connection with investigation of court judge could constitute private citizen speech); *Specht v. City of N.Y.*, 15 F.4th 594, 597, 604 (2d Cir. 2021) (holding fire marshal's report "was not done in his capacity as an employee" where marshal reported to outside agencies on allegedly improper directions received from his supervisors in investigating origins of fire).

Finally, a civilian analogue to Ms. Mule's speech exists. Both public figures and private citizens express their views on Twitter. *See, e.g.*, *Packingham v. North Carolina*, 582 U.S. 98, 104–05 (2017) ("social media users employ [] websites [including Twitter] to engage in a wide variety of protected First Amendment activity on topics 'as diverse as human thought'" (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997))).  The existence of a civilian analogue thus adds further support to the Court's conclusion that Ms. Mule was speaking as a private citizen when posting four of her five tweets and retweets.

The Court finds that one tweet, however, Ms. Mule's June 20, 2022 tweet, was, as alleged in the SAC, posted as a public employee and not as a private citizen.  "The controlling factor in [the] case [of Ms. Mule's June 20, 2022 tweet] is that h[er] expression[] w[as] made pursuant to h[er] duties" as a public high school principal, *Garcetti*, 547 U.S. at 421, as she herself has alleged. Specifically, the SAC alleges that Ms. Mule posted the June 20, 2022 tweet to "convers[e] about race with a fellow DOE member," which, as a DOE principal, she had been asked to do as part of her official responsibilities. (*See* SAC ¶¶ 50–52.)  Thus, as alleged, Ms. Mule's June 20, 2022 tweet was made at the request of Ms. Mule's employer, pursuant to Ms. Mule's official job responsibilities and, therefore, was posted by Ms. Mule as a public employee. *See Weintraub*, 593 F.3d at 203 ("speech can be 'pursuant

39

to' a public employee's official job duties even though it is not required by, or included in, the employee's job description").

### b.    Matters of Public Concern

To establish that a public employee's speech is entitled to constitutional protection, it is not enough that a public employee plausibly alleges that she was speaking as a private citizen; she must also plausibly allege that she was speaking on matters of public concern.  The Court finds that three of Ms. Mule's tweets and retweets described in the June 8, 2023 OEO report (other than the June 20, 2022 tweet), and the tweet linked in the April 3, 2022 New York Post article, address matters of public concern, and are therefore entitled to constitutional protection.

Speech involves matters of public concern when it relates to "any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interest," i.e., "a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).  "The inquiry turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick*, 461 U.S. at 147–48); *see also Snyder*, 562 U.S. at 454 ("no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said").

The "arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Snyder*, 562 U.S. at 453 (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)). "In addition, the fact that a public employee has some personal interest in the subject of the speech does not disqualify the speech from being on a matter of public concern." *Gangadeen v. City of N.Y.*, 654 F. Supp. 2d 169, 183 (S.D.N.Y. 2009) ("Mixed motivations are involved in most actions we perform every day; we will not hold plaintiffs to herculean standards of purity of thought and speech." (quoting *Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir. 2003)) (citing *Reuland v. Hynes*, 460 F.3d 409, 416 (2d Cir. 2006))).

As relevant here, the Supreme Court and Second Circuit have found that the following topics constitute matters of public concern: "corruption in a public program" and the "misuse of state funds," *Lane*, 573 U.S. at 241; "possible governmental misconduct" even if such misconduct comprises "isolated instances of official conduct," *Specht*, 15 F.4th at 601; "the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy," *Snyder*, 562 U.S. at 454; a public "school district's allegedly racially discriminatory policies," *Connick*, 461 U.S. at 146 (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979)); "the health, welfare and safety of young students," *Cioffi*

*v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 164 (2d Cir. 2006); "the quality of education provided by [a] public school as measured by achievement test scores and their year-to-year improvement or deterioration on a schoolwide basis," *Bernheim v. Litt*, 79 F.3d 318, 325 (2d Cir. 1996); and "the New York state public school curriculum," *Jeffries v. Harleston*, 52 F.3d 9, 12 (2d Cir. 1995).

Here, Ms. Mule's three tweets and retweets described in the June 8, 2023 OEO report (other than the June 20, 2022 tweet), and the tweet linked in the April 3, 2022 New York Post article, address matters of public concern. Specifically, one of Ms. Mule's undated retweets addressed the amount of money "poured into schools" as compared to the educational outcomes achieved by the same schools, and, within that discussion, addressed how educational outcomes might be improved by devoting less instructional time to diversity initiatives. (ECF No. 20-3 at 3 (CM/ECF numbering)); *see Jeffries*, 52 F.3d at 12 ("New York state public school curriculum" was a matter of public concern); *Bernheim*, 79 F.3d at 325 (finding "quality of education provided by [a] public school" was a matter of public concern); *Lane*, 573 U.S. at 241 ("misuse of state funds [] obviously involves a matter of significant public concern").

In another undated post, Ms. Mule retweeted a tweet questioning the amount of time and manner in which "gay rights"

were "celebrate[d] . . . in public schools" (ECF No. 20-3 at 3 (CM/ECF numbering)); *see Snyder*, 562 U.S. at 454 (finding "homosexuality in the military" to be a "matter[] of public import").

In an undated tweet, Ms. Mule wrote that she would take herself and her older child "out" of the public school system "if they continue to teach that white people are racist and crazy LGBTQ stuff." (ECF No. 20-3 at 3 (CM/ECF numbering)); *see Connick*, 461 U.S. at 146 ("statements concerning the school district's allegedly racially discriminatory policies involved a matter of public concern" (citing *Givhan*, 439 U.S. 410)); *cf. Cioffi*, 444 F.3d at 164 ("the health, welfare and safety of young students . . . are matters of importance to the public").

Finally, the tweet posted by Ms. Mule and linked in the April 3, 2022 New York Post article addressed a matter of public concern by suggesting that public school attendance was being improperly "inflate[d]" at the direction of "Terrance Paulin," a DOE employee and "Chief Operations Officer [for] Brooklyn North High Schools," a school system within which Ms. Mule was a principal. (SAC ¶¶ 47-48; ECF No. 20-4 at 4 (CM/ECF numbering)); *Specht*, 15 F.4th at 601-02 (reports "implicate[d] matters of public importance" because they "relate[d] to possible governmental malfeasance, public safety, as well as the public fisc").

The Court need not, and does not, decide whether Ms. Mule's June 20, 2022 tweet regarding "black and brown families" addressed a matter of public concern.  As noted above, the SAC alleges that Ms. Mule's June 20, 2022 tweet was posted in her capacity as a public employee, *see supra* Section III.B.1.a, and therefore may not be considered when evaluating her First Amendment retaliation claim.  *See, e.g.*, *Smith v. City of N.Y.*, 130 F. Supp. 3d at 832 (holding one category of speech was made pursuant to teacher's official duties and thus not deciding whether the speech addressed matters of public concern).

Therefore, Ms. Mule's three tweets and retweets described in the June 8, 2023 OEO report (other than the June 20, 2022 tweet), and the tweet linked in the April 3, 2022 New York Post article, address matters of public concern and are protected speech under the First Amendment.

### 2.  Causation

Turning to the next element of her First Amendment retaliation claim, Ms. Mule must plausibly allege that there was a causal connection between her protected First Amendment activity and Defendants' adverse employment action.  "To show causation, 'a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action.'"  *Heim*, 81 F.4th at 222 (quoting *Smith v. County of Suffolk*, 776 F.3d at 118).  "A plaintiff may establish causation either directly through a

44

showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. County of Suffolk*, 776 F.3d at 118 (citing *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)).

Here, the SAC plausibly alleges a causal connection between Ms. Mule's protected speech and Defendants' adverse employment action by specifically asserting that "the only reason for" the "retaliation" against Ms. Mule, including the July 2022 removal of her access to email, her September 6, 2022 reassignment to clerical duties, was her "communication on Twitter" and the June 28, 2022 OEO complaint against Ms. Mule resulting from her communications on Twitter. (*See* SAC ¶¶ 57-62, SAC ¶¶ 78-79); *Heim*, 81 F.4th at 223 (finding employer's actions were expressly caused by plaintiff's speech and therefore causation was established); *cf. Kiernan v. Town of Southampton*, 734 F. App'x 37, 42 (2d Cir. 2018) (noting "causal connection may be established . . . directly through evidence of retaliatory animus" (emphasis removed) (quoting *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987))); *Stajic v. City of N.Y.*, 214 F. Supp. 3d 230, 236 (S.D.N.Y. 2016) (plaintiff sufficiently alleged direct evidence of retaliation "for the views she expressed and positions she took").

### 3.  *Pickering* Balancing

"Even if an employee does speak as a citizen on a matter of public concern" such that she engaged in activity protected by the First Amendment, "the employee's speech is not automatically privileged." *Guarnieri*, 564 U.S. at 386.  Instead, "[c]ourts balance the First Amendment interest of the employee against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering*, 391 U.S. at 568).  If the government shows that "the employee's speech so threatens the government's effective operation that discipline of the employee is justified," then the employee's retaliation claim will fail. *Melzer v. Bd. of Educ.*, 336 F.3d 185, 193 (2d Cir. 2003) (citing *Nat'l Treasury*, 513 U.S. at 466).  Where the employee's interests are outweighed by her employer's, "the employee may still carry the day if [s]he can show that the employer's motivation for the discipline was retaliation for the speech itself, rather than for any resulting disruption." *Id.* (citation omitted).  This analysis is referred to as "*Pickering* balancing," and its resolution is a question of law for the court to decide. *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam); *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999) (district court "erred [by] submitt[ing] the *Pickering* balance test to the jury to resolve").

"[T]o determine the appropriate balance[,] a court should consider both the nature of the speech and the nature of the services performed by the employee." *Blum v. Schlegel*, 18 F.3d 1005, 1011 (2d Cir. 1994).  As to the nature of the speech, "the closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished." *Jeffries*, 52 F.3d at 13 (citation omitted).  As to the services performed by the employee, "[a] position requiring confidentiality, policymaking, or public contact lessens the public employer's burden in firing an employee for expression that offends the employer." *Melzer*, 336 F.3d at 197 (citation omitted); *see id.* at 198-99 (finding plaintiff's "position as a school teacher" weighed in favor of affirming public employer's adverse employment action and was "central" to balancing analysis).

Critically, a public employer need not show a public employee's speech actually caused disruption; "the Government may legitimately respond to a reasonable prediction of disruption." *Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006); *Melzer*, 336 F.3d at 197 ("a showing of probable future disruption may satisfy the balancing test, so long as such a prediction is reasonable" (citing *Waters*, 511 U.S. at 673)); *Jeffries*, 52 F.3d at 13 (holding "'reasonable expectation' that the [employee's] speech would harm"

his employer "was enough to outweigh whatever First Amendment value the [challenged] speech might have had").

*Pickering* balancing is often considered on motions to dismiss in cases where, as here, the record[9] permits resolution of the balancing test. *Kaluczky v. City of White Plains*, 57 F.3d 202, 210 (2d Cir. 1995) (reversing district court's denial of motion to dismiss because, among other reasons, *Pickering* balancing favored public employer); *accord Janus v. AFSCME, Council 31*, 585 U.S. 878, 889, 909–16 (2018) (analyzing, in review of granted motion to dismiss, whether *Pickering* balancing precluded First Amendment claim); *see also Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 51–53 (2d Cir. 2016) (affirming dismissal of high school teacher's First Amendment retaliation claim because "school's concern about the safety of its students and the potential for 'severe disruption' to its functioning" outweighed teacher's First Amendment interest (alteration adopted) (quoting *Melzer*, 336 F.3d at 198)), *aff'g*, 144 F. Supp. 3d 596, 619–20 (S.D.N.Y. 2015) (high school teacher plaintiff failed to state plausible First Amendment retaliation claim where his statements, including statements that

---

[9]    In conducting *Pickering* balancing on a motion to dismiss, the Court may rely on allegations in the operative complaint, the parties' briefs, and publicly available documents of which it may take judicial notice. *See Janus v. AFSCME, Council 31*, 585 U.S. 878, 911–14 & nn.10–22 (2018) (considering publicly available articles and representations in amicus briefs in conducting *Pickering* balancing on appeal from motion to dismiss); *see also Mandell v. County of Suffolk*, 316 F.3d 368, 384 (2d Cir. 2003) (relying on Court's "own review" of the challenged speech to assess whether the speech "was likely to disrupt the [public employer's] operations").

"the school shootings in Newtown, Connecticut, were caused by the government controlling the shooter's mind and . . . his own mind was being controlled," "if shared with students, parents and/or fellow school employees, would have caused substantial (and well-justified) disruption that far exceeded the value of plaintiff's statements").[10]

Here, *Pickering* balancing weighs in favor of Defendants.[11] Ms. Mule's employer, a public school system, has a strong and recognized interest in preventing its employees from "compromis[ing] the learning environment," "provok[ing] anxiety . . . for the average student," or "concern[ing]" parents to the

---

[10]    In other cases, unlike this one, *Pickering* balancing is not appropriately considered on a motion to dismiss due to the presence of factual disputes or an absence of allegations giving rise to a reasonable inference that challenged statements would disrupt the public employer's operations. *See, e.g.*, *Dangler v. N.Y.C. Off Track Betting Corp.*, 193 F.3d 130, 139-40 (2d Cir. 1999) (*Pickering* balancing did not provide basis to dismiss complaint where complaint "g[a]ve[] rise to no inference that [] speech would have weighed against [defendant's] mission or effective operations"); *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 298 (E.D.N.Y. 2009) (declining to consider *Pickering* balancing on motion to dismiss due to presence of a "factual dispute" and difficulty assessing whether "defendants were motivated by retaliation and not by any disruption"); *Festa v. Westchester Med. Ctr. Health Network*, 380 F. Supp. 3d 308, 313, 321 (S.D.N.Y. Mar. 29, 2019) (declining to consider *Pickering* balancing on motion to dismiss because complaint did not permit determination of "whether Defendants fired Plaintiff out of concern that her [allegedly anti-Semitic] Facebook post could disrupt [employer's] ability to effectively perform its important public function, rather than because of her speech's content").

[11]    Although the parties have not raised *Pickering* balancing in their briefs, "the court is obligated to apply the appropriate legal test, regardless of the parties' failure to identify or brief the test correctly." *Manchester v. Town of Ludlow*, 780 F. Supp. 3d 296, 309 n.6 (D. Mass. 2025); *accord Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 99 (1991) (noting court's "independent power to identify and apply the proper construction of governing law"); *Torcivia v. Suffolk County*, 17 F.4th 342, 356 n.24 (2d Cir. 2021) (holding district court did not abuse its discretion in deciding motion on legal grounds other than those raised by parties).

point of "interrupting the[ir] children's education, impairing the school's reputation, and impairing the educationally desirable interdependency and cooperation among parents, teachers, and administrators." *Melzer*, 336 F.3d at 199. Defendants also have a strong interest in avoiding reputational harm due to the potential public perception that their schools were "staffed by racially biased" administrators, a public perception that would be invited by Ms. Mule's tweets and retweets containing derogatory comments concerning "black and brown families" and students. *See Castine v. Zurlo*, 756 F.3d 171, 175 (2d Cir. 2014) (noting Second Circuit has previously concluded adverse employment actions were justified where police officers "disseminated racially biased public speech, notwithstanding that they were speaking anonymously as private citizens, on their own time, and on matters of public concern," because "a police department is impaired in the performance of its duties to the extent it is viewed by the public as staffed by racially biased officers" (citing *Locurto*, 447 F.3d at 178; *Pappas v. Giuliani*, 290 F.3d 143, 146–47 (2d Cir. 2002)).

In recognition of the foregoing interests, as reflected in Chancellor's Regulation A-830, Defendants reasonably concluded, as set forth in the June 8, 2023 OEO report, that four of Ms. Mule's tweets and retweets "created a hostile environment based on gender, race, and sexual orientation in violation of Chancellor's Regulation A-830." (ECF No. 20-3 at 5 (CM/ECF numbering).) As

noted above, Chancellor's Regulation A-830 prohibits conduct that "would foreseeably disrupt the educational process or [] would foreseeably endanger the health, safety, morals, or welfare of the school community." *See* Chancellor's Regulation A-830, *supra* note 2, § I.B.4.

"Compared with these strong governmental interests, [Ms. Mule's] interest in the speech alleged in the complaint was minimal." *Manchester*, 780 F. Supp. 3d at 310. First, it is especially significant that Ms. Mule's June 20, 2022 tweet -- in which she wrote "black and brown families [are] not as invested in children['s] education, promote/excuse very poor behavior[,] exhibit poor effort/interest in children's education[, and] [s]tudents exhibit poor effort" (ECF No. 20-3 at 3 (CM/ECF numbering)) -- is not entitled to constitutional protection.[12] Ms. Mule's June 20, 2022 tweet thus adds nothing to Ms. Mule's side of the *Pickering* balancing analysis, and yet it weighs strongly in favor of Defendants. Ms. Mule's June 20, 2022 tweet, "if shared with students, parents and/or fellow school employees, would have caused substantial (and well-justified) disruption that far exceeded the value of plaintiff's" statements. *Heller*, 144 F. Supp. 3d at 619-20, *aff'd*, 665 F. App'x 49; *see also Melzer*, 336 F.3d at 198-99. Thus, the June 20, 2022 tweet, considered alone,

---

[12]    *See supra* Section III.B.1.a.

justified adverse employment actions taken by Defendants against Ms. Mule.  The First Amendment interests implicated by Ms. Mule's four other tweets and retweets -- which complain of "crazy LGBTQ stuff," question the celebration of "gay rights," discuss (without endorsing) "violence against queer folk," and question DOE attendance policy, (ECF No. 20-3 at 3 (CM/ECF numbering); SAC ¶ 48) -- are similarly outweighed by Defendants' considerable interests in preventing disruption, preserving the public employer's reputation, and securing the integrity of the public employer's operations.  *See Lewis*, 165 F.3d at 164-65 (public employer's interest outweighed employee's "significant interest in speaking . . . on a matter of public concern" where employer had "reasonable belief" that employee's speech "might impair [its] operations").

The public nature of Ms. Mule's tweets and retweets, in which she identifies herself as a "principal of a small high school," underscores the inevitability of disruption that they would cause. *Compare Delano v. City of Buffalo*, 626 F. App'x 23, 24 (2d Cir. 2015) (*Pickering* balancing favored defendants where public employee "spoke to the media [and] suppl[ied] departmental photographs and videos to the press in violation of regulations"), *with Feingold v. New York*, 366 F.3d 138, 160 n.21 (2d Cir. 2004) (*Pickering* balancing less likely to favor employer where public employee's complaints were "entirely internal").  Moreover, Ms. Mule's role as a high school principal is "central" to the

*Pickering* balancing analysis, as she "act[ed] *in loco parentis* for a group of students," *Melzer*, 336 F.3d at 199 (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995)), that included "Black and Hispanic" students, (SAC ¶ 11), who, Ms. Mule wrote, "exhibit poor effort."  (SAC ¶ 51.)

Accordingly, Defendants' actions in response to Ms. Mule's tweets and retweets were justified under *Pickering* balancing.  *See Delano*, 626 F. App'x at 24 (police officer's interest in publicizing "what he believes is an injustice in [a] [murder] investigation" was outweighed by police commissioner's "duty to ensure that he maintained a 'significant degree of control over [his] employees' words and actions [as] without it, there would be little chance for the efficient provision of public services'" (third alteration in original) (quoting *Garcetti*, 547 U.S. at 418) (citation omitted)); *Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir. 1998) (noting plaintiff's purportedly protected speech violated established regulation and therefore could not sustain a First Amendment retaliation claim); *Castine*, 756 F.3d at 173, 177–78 (public employer's interest in "preserv[ing] the integrity of the [local] Board of Elections and [] enforc[ing]" a local law outweighed any First Amendment interest of a public employee who

sought to run for local office while serving as election commissioner in violation of the local law).[13]

Ms. Mule "has also failed to plausibly allege that the defendants were motivated by a desire to retaliate against [her] for [her] views." *Heller*, 665 F. App'x at 52, *aff'g*, 144 F. Supp. 3d at 620 ("It is implausible based on the allegations, furthermore, to believe that defendants were motivated by an improper retaliatory motive rather than by concerns about . . . the risks that [plaintiff] posed to the school and the community."); *see also Melzer*, 336 F.3d at 199-200 (rejecting schoolteacher's contention that school's decision to terminate him was "motivated by a desire to retaliate against him for his" protected association because there was "no proof in the record of retaliatory motive").

Thus, dismissal of Ms. Mule's First Amendment retaliation claim is warranted because any First Amendment interest implicated

---

[13]    *See also Sacha v. Sedita*, 543 F. App'x 115, 116 (2d Cir. 2013) (assistant district attorney's press release accusing district attorney of corruption "was sufficiently disruptive" to justify termination), *aff'g*, No. 09-cv-1119(WMS), 2012 WL 5207528 (W.D.N.Y. Oct. 22, 2012); *Locurto*, 447 F.3d at 182-83 ("defendants' interest in maintaining a relationship of trust between the police and fire departments and the communities they serve outweighed the plaintiffs' expressive interests" in displaying "racially insensitive" parade float); *Pappas*, 290 F.3d at 147 (police department's interest in avoiding "damage [to] the effectiveness of the police department in the community" in the form of "resentment, distrust, and racial strife" outweighed police officer's First Amendment interest in "disseminat[ing] leaflets that trumpet[ed] bigoted messages expressing hostility to Jews, ridiculing African Americans and attributing to them a criminal disposition to rape, robbery, and murder"); *id.* at 147-48 (rejecting employee's contention that *Pickering* balancing was inapplicable to his anonymous leaflets because "[a]lthough [plaintiff] tried to conceal his identity . . . , he took the risk that the effort would fail").

by her tweets and retweets is outweighed by Defendants' interest in avoiding harm from likely disruption caused by the tweets and retweets.  Accordingly, Defendants' motion to dismiss Ms. Mule's First Amendment retaliation claim against all Defendants is **GRANTED**.

### 4.  *Monell* Liability

Defendants argue that Ms. Mule's First Amendment claim "fails to the extent it is pled against DOE."  (ECF No. 21 at 19.)  The Court agrees.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents" unless such injury is the result of the "execution of a government's policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *accord Anilao v. Spota*, 27 F.4th 855, 873–74 (2d Cir. 2022) (noting *Monell* "extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation" (emphasis removed) (citation omitted)).

Here, although the SAC alleges that Ms. Mule was investigated and reassigned pursuant to Chancellor's Regulation A-830 (*see* SAC ¶ 62; ECF No. 22 at 10, 22), such allegations are "deficient" to plead municipal liability. *See Alexander v. N.Y.C. Dep't of Educ.*, No. 19-cv-7023(AJN), 2020 WL 7027509, at *12 (S.D.N.Y. Nov. 30, 2020) (dismissing *Monell* claim even where plaintiff alleged that

Chancellor's Regulation A-830 could lead teachers to be subjected to corrective actions without due process); *accord Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008).

Thus, even if the Court did not grant Defendants' motion to dismiss Ms. Mule's First Amendment retaliation claim as to all Defendants for the reasons set forth above, it would, and does, pursuant to *Monell*, grant Defendants' motion to dismiss Ms. Mule's First Amendment retaliation against the City Defendants.

### 5.  Personal Involvement

Aside from reasons already set forth above warranting dismissal of Ms. Mule's First Amendment claim against all Defendants, dismissal of the First Amendment claim against Ms. Goldberg is also warranted because Ms. Mule has insufficiently alleged Ms. Goldberg's personal involvement.

"If a defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant." *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014).  To show personal involvement, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676); *accord Alexander v. City of Syracuse*, 132 F.4th 129, 160 (2d Cir. 2025).  "Personal involvement may be shown by direct participation, which requires

in this context intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (internal quotation marks and citation omitted).

Here, the SAC fails to allege that Ms. Goldberg, through her own individual actions, intentionally participated in conduct constituting a constitutional violation of Ms. Mule's First Amendment rights. Ms. Goldberg's involvement is limited to visiting Ms. Mule's school, initiating an OEO complaint against Ms. Mule, and responding to OEO's requests for information in connection with the ensuing, allegedly "flawed" investigation that resulted in substantiated charges against Ms. Mule. (*See* SAC ¶¶ 29, 61–62; ECF No. 20-3 at 2–5 (CM/ECF numbering).) Ms. Goldberg is not alleged to have taken any other action against Ms. Mule. Moreover, the SAC does not plausibly allege that Ms. Goldberg knew facts rendering any of her conduct illegal. Thus, the SAC does not plausibly allege Ms. Goldberg's personal involvement in Ms. Mule's First Amendment retaliation claim. *See Victory*, 814 F.3d at 67 (holding defendants were not liable for § 1983 claim due to their lack of personal involvement even where they "directly participated in [a] procedurally defective rescission of [plaintiff's] parole," because they did not "kn[o]w of the facts making the process illegal"); *Peck v. County of Onondaga*, No. 21-cv-651(DNH), 2021 WL 3710546, at *11, *17

(N.D.N.Y. Aug. 20, 2021) (dismissing First Amendment retaliation claim against a defendant due to lack of allegations concerning personal involvement of the defendant).

Accordingly, even if the Court did not grant Defendants' motion to dismiss Ms. Mule's First Amendment retaliation claim as to all Defendants for the reasons noted above, it would grant Defendants' motion to dismiss Ms. Mule's § 1983 claim for First Amendment retaliation against Ms. Goldberg due to her lack of alleged personal involvement.

## IV. LEAVE TO AMEND

Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint is freely given "when justice so requires." Therefore, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (citations omitted). A court may, however, dismiss claims without leave to amend where the proposed amendments would be futile, *see Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)), or where a plaintiff has "failed to specify how it could cure its pleading deficiencies." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014). An amendment to the complaint is futile if the "proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir.

2002) (citation omitted). Leave to amend may also be denied where, as here, previous amendments have not cured the complaint's deficiencies. *Ruotolo*, 514 F.3d at 191 (citing *Foman*, 371 U.S. at 182); *see also De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 72 (2d Cir. 1996) (collecting cases and noting that the Second Circuit has "upheld decisions to dismiss a complaint without leave to replead when a party has been given ample prior opportunity to allege a claim").

Here, Ms. Mule has filed three complaints but has failed to state a claim. Under these circumstances any amendment would be futile. Moreover, Ms. Mule has not requested leave to further amend or suggested how she would amend her complaint if given leave to do so.[14] The SAC is, therefore, dismissed with prejudice. *See, e.g.*, *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 55 (2d Cir. 2025) (affirming district court's denial of leave to amend where plaintiff requested leave to amend "in a single footnote on the final page of her brief"); *TechnoMarine*, 758 F.3d at 505-06 (affirming dismissal with prejudice and without leave to amend where plaintiff failed to specify how it could cure its pleading deficiencies); *Madej v. Yale Univ.*, No. 21-353, 2022 WL 710905, at

---

[14]    Ms. Mule states, in a footnote of her October 28, 2024 opposition, that she "**will be** seeking to amend . . . under the New York State and New York City Human Rights Law." (ECF No. 22 at 14 n.1 (emphasis added).) Ms. Mule suggests that her anticipated request to amend would be based on service of "charges under NYS Education Law 3020A seeking her removal as a tenured employee." (*Id.*) Ms. Mule does not reveal how any anticipated, yet unrequested, amendment would address the deficiencies identified in Defendants' motion papers.

*4 (2d Cir. Mar. 10, 2022) (affirming dismissal with prejudice and without leave to amend where plaintiff "never requested leave to amend his complaint for a third time"); *Document Techs., Inc. v. LDiscovery, LLC*, 731 F. App'x 31, 34-35 (2d Cir. 2018).

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss Plaintiff's Second Amended Complaint in its entirety. Leave to amend has not been sought and in any event would be denied as futile. The Second Amended Complaint is therefore dismissed with prejudice. The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

Dated: August 21, 2025
       Brooklyn, New York

_____
**Hon. Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York